## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| WHITEFORD, TAYLOR, | * | |
| PRESTON, LLP | * | |
| 7 Saint Paul Street | * | |
| Baltimore, MD 21202, | * | |
|  | * | |
| Plaintiff, | * | |
|  | * | |
| v. | * | Case No. _____ |
|  | * | |
| VICKY McCAULEY | * | |
| 2113 Marymount Arch | * | |
| Virginia Beach, VA 23464, | * | |
|  | * | |
| AND | * | |
|  | * | |
| JEANI WILLIAMS | * | |
| 32088 Windjammer Drive | * | |
| Lewes, DE 19958, | * | |
|  | * | |
| Defendants. | * | |

### COMPLAINT AND REQUEST FOR
### TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiff, Whiteford, Taylor, Preston, LLP (referred to as "Plaintiff," "Whiteford," or the "Firm") states as follows by way of complaint against Vicky McCauley ("McCauley") and Jeani Williams ("Williams") (collectively, "Defendants"):

### <u>INTRODUCTION</u>

During Vicky McCauley and Jeani Williams's respective employment as paralegals at the Firm, each routinely worked alongside an Equity Partner ("Equity Partner Co-Conspirator #1") in the Firm's Trust and Estate practice group. By mid-June of 2025, Equity Partner Co-Conspirator #1 and McCauley notified the Firm that they would be

departing to join another law firm. Prior to and during Equity Partner Co-Conspirator #1's tenure with the Firm, with support from McCauley and Williams, Equity Partner Co-Conspirator #1 developed attorney-client relationships with various Trust and Estate clients. The Firm maintained many Trust and Estate clients with whom Equity Partner Co-Conspirator #1, McCauley, and Williams did not have routine contact and/or for whom Equity Partner Co-Conspirator #1, McCauley, and Williams would have no reason to believe Equity Partner Co-Conspirator #1 had any relationship whatsoever.

In preparation for Equity Partner Co-Conspirator #1's departure, the Firm attempted to collaborate with Equity Partner Co-Conspirator #1 to develop mutually agreeable language to include in a joint letter to send to clients that Equity Partner Co-Conspirator #1 originated, or with whom she worked directly, to ensure a smooth transition for any clients seeking to have matters transferred to Equity Partner Co-Conspirator #1's new firm. Equity Partner Co-Conspirator #1 actively resisted this effort, insisting that the letter must be biased in her favor instead of remaining neutral.

The Firm subsequently discovered that Equity Partner Co-Conspirator #1 and McCauley sent Firm clients multiple variations of the joint letter that deviated from the language the Firm had approved – some of which included a digital signature of the Firm's Managing Partner, Martin Fletcher, without his authorization. Distinguishable from the agreed-upon language, several of the letters that Equity Partner Co-Conspirator #1 and McCauley sent included additional rhetoric that defamed the Firm by falsely implying that the Firm did not secure or properly maintain client records. Upon information and belief, Equity Partner Co-Conspirator #1, McCauley, and Williams made the same defamatory

statements in oral communications to the Firm's clients, even before such communication regarding their anticipated transition was authorized.

Not only did these letters contain a false implication defaming the Firm, Equity Partner Co-Conspirator #1 and McCauley also sent letters to various Firm clients who were not clients of Equity Partner Co-Conspirator #1's, notwithstanding explicit instructions from the Firm to the contrary. Equity Partner Co-Conspirator #1 and McCauley were able to do so only after misappropriating client contact information from the Firm. Upon examination of McCauley's computer, the Firm discovered that McCauley abused her access to the Firm's confidential client lists, while still employed by the Firm, to obtain contact information for clients beyond those with whom Equity Partner Co-Conspirator #1 and McCauley worked directly. Equity Partner Co-Conspirator #1 and McCauley sent copies of the Firm client lists as well as other Firm property to multiple personal email addresses prior to their last day with the Firm.

Equity Partner Co-Conspirator #1 and McCauley's intentional misrepresentations to the Firm's clients surrounding the security of their files were designed to raise concern amongst Firm clients, thereby undermining the trust and confidence instilled in the Firm. In order to stabilize the situation and prevent further misrepresentation and damage, as soon as the Firm became aware of Equity Partner Co-Conspirator #1 and McCauley's submission of unauthorized letters, the Firm froze Equity Partner Co-Conspirator #1's and McCauley's access to its network.

During this period, Williams announced her resignation and misrepresented to the Firm that she was not joining Equity Partner Co-Conspirator #1 and McCauley.  The Firm

processed Williams's resignation as normal in the course of business based on this misrepresentation but, upon information and belief, the misrepresentation was made for the purpose of concealing her role in the conspiracy to divert Firm clients while she remained employed after Equity Partner Co-Conspirator #1's and McCauley's departure.

Equity Partner Co-Conspirator #1, McCauley, and Williams continued to pursue their conspiracy to interfere with the Firm's relationships with its clients, including taking actions designed to confuse clients into paying their new employer, Offit Kurman, for services rendered by the Firm, and otherwise taking actions to divert funds earned by the Firm to be paid instead to Offit Kurman.

It can be reasonably presumed that McCauley will continue to utilize the misappropriated client list and undermine the Firm's ability to compete by her persistent defamatory communications to the Firm's clients. The loss of the Firm's clients will result in ongoing harm to the Firm.

## PARTIES AND JURISDICTION

1.      Plaintiff Whiteford, Taylor, & Preston LLP is a law firm located at 7 Saint Paul Street, Baltimore, Maryland 21202.

2.      Defendant Vicky McCauley is a former employee of Whiteford who is domiciled in Virginia and maintains a residence at 2113 Marymount Arch, Virginia Beach, VA 23464.

3.      Defendant Jeani Williams is a former employee of Whiteford who is domiciled in Delaware and maintains a residence at 32088 Windjammer Drive, Lewes, DE 19958.

4.      This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

5.      Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

## FACTS RELATING TO ALL COUNTS

1.      Whiteford is a successful, full-service law firm that originated in Baltimore in 1933 and has grown into a leading Mid-Atlantic law firm with 15 offices, including one in Baltimore, a total of four in Maryland, and another four in Virginia.

2.      The Firm has built its practice on providing a business-like approach to the practice of law and providing a comprehensive range of legal and litigation services to clients of all sizes.

3.      In the past 92 years, the Firm has established a strong reputation for its knowledge, expertise, reliability, and professionalism.

4.      To attain and protect this reputation, and effectively service its clients, the Firm has diligently implemented policies, procedures, guidelines, and systems to properly secure its clients' files.

5.      The legal industry is highly competitive. Clients typically retain law firms based on prior results, relationships with individuals, quality of services provided, expertise, trust, and confidence.

6.      During the course of employment, Whiteford partners and paralegals have access to confidential information, including the Firm's lists containing the names and

contact information of its clients, as well as information regarding the client's needs. Employees are given access to such information solely for the purpose of performing work on behalf of the Firm and in furtherance of the Firm's representation of its clients.

7.     Misappropriation of such information could result in a disruption to the trust and confidence critical to maintain the Firm's relationship with its clients.  As such, the Firm carefully guards its client contact information by applying numerous internal policies, procedures, and guidelines.

8.     The Firm's Employee Handbook contains a Confidentiality and Non-Disclosure Policy that states all employees have "an absolute duty to maintain strict confidentiality regarding all client matters, internal affairs and operations, partners, employees, and other personnel associated with the Firm." The Policy clearly and explicitly states that "client lists and case information" are confidential. Additionally, the Firm's Email Communications Policy and Practices section of the Employee Handbook states that employees are prohibited from sending client information to a personal email account and from using Firm systems for reasons other than business.

**A. Defendants' Employment at the Firm**

9.     Equity Partner Co-Conspirator #1 joined the Firm on January 29, 2024, as an attorney in the Trust and Estate practice.[1]

10.     On February 20, 2024, the Firm hired McCauley as a paralegal for its Trust and Estate practice.

---

[1] As an Equity Partner of the Firm, Equity Partner Co-Conspirator #1 is subject to a mandatory arbitration agreement.

11.     On August 12, 2024, the Firm hired Williams as a paralegal for its Trust and Estate practice.

12.     Defendants worked under the supervision of Equity Partner Co-Conspirator #1 and other Firm attorneys.

13.     On December 31, 2024, a Whiteford shareholder, MaryEllen Willman ("ME") retired.

14.     At that time, ME's clients were transferred to other attorneys at the Firm, including Equity Partner Co-Conspirator #1.

15.     Given the nature of clients to a Trust and Estate practice, some of ME's clients required on-going legal representation from Equity Partner Co-Conspirator #1, while others did not.

16.     In their positions, Defendants had access to the Firm's confidential client lists, including a list of all of ME's former clients, which included clients with whom Equity Partner Co-Conspirator #1 never worked and was never assigned.

17.     McCauley notified the Firm of her intent to resign on or around June 20, 2025.

**B. Equity Partner Co-Conspirator #1 and McCauley Send Out Various Unauthorized and Defamatory Letters**

18.     On or about June 23, 2025, the Firm provided Equity Partner Co-Conspirator #1 with a proposed draft of the "Notice of Transfer of [Equity Partner Co-Conspirator #1]'s from Whiteford, Taylor and Preston, LLP to Offit Kurman, PC" (the "Approved Letter"),

which notified various clients of Equity Partner Co-Conspirator #1's upcoming departure and the client's right to transfer its matter with her or remain with the Firm.

19.    This correspondence was only approved to be sent to clients with whom Equity Partner Co-Conspirator #1 had actively worked.  Indeed, Equity Partner Co-Conspirator #1 was explicitly directed not to send the letter to any clients of ME's with whom she had never directly communicated.  Those clients were to be reassigned to other Firm attorneys given that Equity Partner Co-Conspirator #1 had no relationship with them.

20.    Equity Partner Co-Conspirator #1 actively resisted the Firm's efforts to prepare joint language to be sent to Equity Partner Co-Conspirator #1's clients.  In particular, she insisted (in writing) that the letter be biased in her favor, instead of containing neutral language.

21.    Subsequently, McCauley, on behalf of and at the direction of Equity Partner Co-Conspirator #1, sent to clients various versions of the letter which had <u>not</u> been authorized by the Firm (the "Unauthorized Letters"), some of which falsely appeared to be approved joint letters containing a digital signature of the Firm's Managing Partner, Martin Fletcher, without his authorization.

22.    Many of these Unauthorized Letters contained language misrepresenting the Firm's security of client documents.

23.    These Unauthorized Letters were sent to Firm clients across Maryland, Virginia, and Washington DC, notwithstanding the fact that Equity Partner Co-Conspirator #1 is not licensed to practice law in the State of Maryland.

24.     The Unauthorized Letters were also sent by Equity Partner Co-Conspirator #1 and McCauley to clients of ME's in direct contravention of the Firm's instructions.

25.     In addition, Equity Partner Co-Conspirator #1 and McCauley concealed their conduct by refusing to comply with the Firm's request to be carbon copied on the transmittal of these letters.

## C. Equity Partner Co-Conspirator #1, McCauley, and Williams Make Defamatory Oral Communications

26.     In addition, upon information and belief, prior to the submission of the Unauthorized Letters and while still employed by the Firm, Equity Partner Co-Conspirator #1 and McCauley solicited several Firm clients.

27.     Upon information and belief, in these oral communications, Equity Partner Co-Conspirator #1 and McCauley made defamatory statements regarding the Firm, including misrepresenting the Firm's security of client documents.

28.     The Firm has also learned that Williams similarly made defamatory statements misrepresenting the Firm's security of client documents.

## D. Equity Partner Co-Conspirator #1, McCauley, and Williams Steal Client Lists and Records from the Firm and Divert Funds from the Firm

29.     Leading up to and following their departure from the Firm, Equity Partner Co-Conspirator #1 and McCauley attempted to contact Firm clients with whom neither had previously worked.

30.     For example, upon information and belief, McCauley sent Unauthorized Letters to ME clients, including at least one with whom Equity Partner Co-Conspirator #1 and McCauley never actively worked.

31.     Additionally, Equity Partner Co-Conspirator #1 interfered with the Firm's relationship with a former ME client in Maryland ("Client #1"). ME had been named as trustee on Client #1's estate. Client #1 died after ME retired. Upon information and belief, Client #1's beneficiaries were contacted directly or indirectly by Equity Partner Co-Conspirator #1 for the purpose of proposing Equity Partner Co-Conspirator #1 as the new trustee in place of ME following Client #1's death. Williams advised Firm partner Emily Lashley that in response to this solicitation, the client's daughter elected not to work with Equity Partner Co-Conspirator #1. Equity Partner Co-Conspirator #1, who is not barred in Maryland, should not have solicited this work or proposed herself as trustee, whether directly or indirectly through her co-conspirators.

32.     When Lashley directed Williams, during Williams's employment, to prepare and process paperwork to appoint Lashley as trustee for Client #1 in place of ME, for over a month Williams repeatedly ignored or otherwise refused to follow directives to prepare and process the paperwork. Upon information and belief, Willaims acted at Equity Partner Co-Conspirator #1's direction or in Equity Partner Co-Conspirator #1's interest by interfering with the appointment of Lashley as Trustee and to the detriment of the Firm.

33.     Defendants and Equity Partner Co-Conspirator #1 obtained contact information to communicate with Firm clients by stealing the Firm's confidential client list(s). For example, on June 23, 2025, following both Equity Partner Co-Conspirator #1 and McCauley's resignations from the Firm, Equity Partner Co-Conspirator #1 sent McCauley an email attaching three lists of ME's active clients sorted by jurisdiction: Maryland, DC, and Virginia. Also attached to said email was a Referral Mailing List.

34.    While still employed by the Firm, Defendants sent these client lists to various personal email addresses.

35.    For example, forensic examination of Equity Partner Co-Conspirator #1's Firm laptops revealed that, prior to her departure, Equity Partner Co-Conspirator #1 sent to her personal e-mail address various client lists, including a list containing ME's Maryland clients, whom Equity Partner Co-Conspirator #1 could not have represented, as well as marketing materials belonging to the Firm.

36.    Forensic examination of McCauley's Firm laptop similarly revealed that McCauley sent to personal email addresses belonging to her herself and Equity Partner Co-Conspirator #1 various client lists, and also connected an external thumb drive to her Firm laptop to which she saved the same or similar documents. For example:

  a.  On June 16, 2025, before she submitted her notice of resignation to the Firm, McCauley sent Equity Partner Co-Conspirator #1 an email to her personal email address which contained a file entitled, "RAM edited contacts June 13, 2025.xlsx."

  b.  On June 23, 2025, McCauley sent Equity Partner Co-Conspirator #1 an updated spreadsheet entitled, "RAM edited contacts June 23, 2025.xlsx."

  c.  On June 25, 2025, days after submitting her notice of resignation to the Firm, McCauley connected an external hard drive and downloaded the same documents described above.

37.    Upon information and belief, and based on the refusal to supply any substantive response to the pre-litigation directives to return Firm information and account

for their contacts with Firm clients, Equity Partner Co-Conspirator #1 and McCauley maintain a copy of these client lists to date.

38.    Examination of Williams's Firm e-mail account similarly revealed that Williams, while employed by the Firm, sent several communications to Equity Partner Co-Conspirator #1 containing the Firm's confidential information and diverting business to Equity Partner Co-Conspirator #1 at Offit Kurman. For example:

> a.    On June 23, 2025, Williams sent an email to Equity Partner Co-Conspirator #1 and McCauley, *after* each had resigned from the Firm, attaching an "updated list of all [Client #2] cases" with the reminder that, "[**m**]**oving forward** let's reference them as [Client #2] and drop the [REDACTED] reference since that is no longer what they go by." (emphasis added).
>
> b.    On June 24, 2025, Williams sent an email to [Client #2], BCC'ing Equity Partner Co-Conspirator #1 (on her email address with her new firm), providing an update to one of the client's matters.
>
> c.    On July 7, 2025, Williams sent an email to Equity Partner Co-Conspirator #1, CC'ing Client #2, providing her with "assignments and contingent fee terms" originally sent to Ellen Moroney, a Firm attorney.
>
> d.    On July 7, 2025, Williams sent Equity Partner Co-Conspirator #1 yet another email attaching an "[u]pdated [Client #2] case list."
>
> e.    On July 9, 2025, Williams redirected correspondence to Equity Partner Co-Conspirator #1 at Offit Kurman from an individual that sought to connect

with the replacement for former Firm attorney, Jessica Gorsky, who purportedly "took over from MaryEllen."

f. On July 10, 2025, Williams sent an email to Client #2, CC'ing Equity Partner Co-Conspirator #1, attaching "Receipt & Releases" regarding one of its matters and stating that "until I am up and running at Offit Kurman, please feel free to reach me on my personal cell if you have any questions. I am happy to help so that nothing falls through the cracks during the transition."

g. On July 10, 2025, Williams sent Equity Partner Co-Conspirator #1 an email forwarding one of Client #2's emails and attachments with the comment that she was "[f]orwarding for the file since I will not have access to my email."

h. On July 11, 2025, Williams sent an email to Client #2, CC'ing Equity Partner Co-Conspirator #1, stating that it is Williams' last day at the Firm and providing her new Offit Kurman email address.

   i. This email contained an attachment pertaining to the Firm's representation of the client.

i. On July 11, 2025, Williams sent an email to Equity Partner Co-Conspirator #1 attaching various other documents pertaining to the Firm's representation of various matters for Client #2.

39.    During a significant period of the time that Williams was engaging in these activities with Equity Partner Co-Conspirator #1, Williams, utilizing an automatic reply on her Firm email account, claimed to be "out of the office on PTO" with "limited access to email."

40.    In addition, upon information and belief, Equity Partner Co-Conspirator #1 and Williams made unsuccessful attempts to divert funds to their new law firm, Offit Kurman, for services Equity Partner Co-Conspirator #1 or others performed while she was still a Partner of the Firm.

41.    Similarly, Williams has requested that funds deposited into the Firm's trust account for work performed by Equity Partner Co-Conspirator #1 or others while she was a Partner at the Firm be sent to Offit Kurman for distribution by Client #3.

42.    Therefore, upon information and belief, Equity Partner Co-Conspirator #1 and Williams are actively conspiring to divert fees due and owing to the Firm to Offit Kurman.

**E.  The Firm Mitigates its Damages**

43.    On or around June 28, 2025, the Firm discovered that Equity Partner Co-Conspirator #1 and McCauley had sent out the Unauthorized Letters.

44.    The Firm later discovered an email from Equity Partner Co-Conspirator #1 to McCauley directing her to send the Unauthorized Letters.

45.    Finally, the Firm recovered numerous Unauthorized Letters sent via DocuSign in McCauley's "Deleted Items" folder in a blatant attempt to conceal her and Equity Partner Co-Conspirator #1's wrongful actions.

46.    The Firm immediately took action to contain its damages by freezing Equity Partner Co-Conspirator #1 and McCauley's accounts and access to its network, as well as cancelling the transmittal of the Unauthorized Letters via DocuSign.

47.    The Firm subsequently sent a cease-and-desist letter to McCauley demanding that she account for and return Firm property and account for all communications with Firm clients. McCauley never provided a substantive response.

**F. Defendants' Separation from the Firm**

48.    McCauley's employment with the Firm ended on or about June 30, 2025.

49.    Subsequently, despite informing some at the Firm that she was not joining Equity Partner Co-Conspirator #1 and McCauley, Williams submitted her voluntary resignation from the Firm in order to join Equity Partner Co-Conspirator #1 and McCauley at a competing firm.  Her last day of employment with the Firm was July 11, 2025.

<u>**COUNT ONE**</u>
**(Breach of Fiduciary Duty)**

50.    The Firm repeats and incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if set forth fully herein.

51.    As employees of the Firm and subject to the Firm's Confidentiality and Non-Disclosure Policy, Defendants owed a fiduciary duty to the Firm.

52.    McCauley breached her fiduciary duty to the Firm when she, while still a paralegal at the Firm, misappropriated the Firm's confidential information, and assisted in sending  communications on behalf of the Firm's Managing Partner without authorization, and further instigated several defamatory communications disparaging the Firm, all in her pursuit to divert business from the Firm for her and Equity Partner Co-Conspirator #1's personal gain.

53.    Williams breached her fiduciary duty to the Firm when she, while still a paralegal at the Firm, misappropriated the Firm's confidential information, engaged in efforts to divert business and funds from the Firm to Offit Kurman, and further instigated several defamatory communications disparaging the Firm, all in her pursuit to divert business from the Firm for her and Equity Partner Co-Conspirator #1's personal gain.

54.    The Firm has been, and continues to be, damaged by Defendants' actions.

## COUNT TWO
### (Misappropriation of Trade Secrets in
### Violation of the Defend Trade Secrets Act of 2016)

55.    The Firm repeats and incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if set forth fully herein.

56.    Under the Defend Trade Secrets Act ("DTSA"), the term trade secret "means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value

from the disclosure or use of the information[.]"

18 U.S.C. § 1839(3).

57.     The Firm's confidential client/matter lists and fee arrangements constitute "trade secrets" under the DTSA.

58.     The Firm's confidential client/matter lists and fee arrangements derive independent economic value from not being generally known to, or being readily ascertainable through proper means by, its competitors.

59.     The Firm took reasonable efforts to keep the information contained in its client/matter lists and fee arrangements confidential.

60.     Defendants misappropriated the Firm's client/matter lists and fee arrangements and, upon information and belief, are using or intends to use them to the detriment of the Firm in the future.

61.     Defendants' actions violate the Defend Trade Secrets Act of 2016, 19 U.S.C. § 1836.

62.     Unless Defendants are enjoined, the Firm will be irreparably damaged.  The Firm is entitled to damages as a result of Defendants' violations of the law, including its actual losses, losses measured by the unjust enrichment caused by the misappropriation, exemplary damages, injunctive relief and attorneys' fees.

## COUNT THREE

### (Misappropriation and/or Violation of the
### Maryland Uniform Trade Secrets Act)

63.     The Firm repeats and incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if set forth fully herein.

64.     Under the Maryland Uniform Trade Secrets Act ("MUTSA"), the term "trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:

> (1)     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (2)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

MD. CODE ANN. COMM. LAW § 11-1201(e).

65.     The Firm's confidential client/matter lists and fee arrangements constitute "trade secrets" under the MUTSA.

66.     The Firm's confidential client/matter lists and fee arrangements derive independent economic value from not being generally known to or being readily ascertainable through proper means by its competitors.

67.     The Firm took reasonable efforts to keep the information contained in its client/matter lists and fee arrangements confidential.

68.     Defendants misappropriated the Firm's client/matter lists and fee arrangements and, upon information and belief, are using or intends to use them to the detriment of the Firm in the future.

69.     Defendants' actions violate the Maryland Uniform Trade Secrets Act.

70.     Unless Defendants are enjoined, the Firm will be irreparably damaged. The Firm is entitled to damages as a result of Defendants' violations of the law, including its actual losses, losses measured by the unjust enrichment caused by the misappropriation, exemplary damages, injunctive relief and attorneys' fees.

## COUNT FOUR
### (Misappropriation and/or Violation of the
### Virginia Uniform Trade Secrets Act)

71.     The Firm repeats and incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if set forth fully herein.

72.     Under the Virginia Uniform Trade Secrets Acts ("VUTSA"), the term "trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:

> Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

VA. CODE § 59.1-336.

73. The Firm's confidential client/matter lists and fee arrangements constitute "trade secrets" under the VUTSA.

74. The Firm's confidential client/matter lists and fee arrangements derive independent economic value from not being generally known to or being readily ascertainable through proper means by its competitors.

75. The Firm took reasonable efforts to keep the information contained in its client/matter lists and fee arrangements confidential.

76. Defendants misappropriated the Firm's client and matter lists and fee arrangements and, upon information and belief, are using or intends to use them to the detriment of the Firm in the future.

77. Defendants' actions violate the Virginia Uniform Trade Secrets Act.

78. Unless Defendants are enjoined, the Firm will be irreparably damaged. The Firm is entitled to damages as a result of Defendants' violations of the law, including its actual losses, losses measured by the unjust enrichment caused by the misappropriation, exemplary damages, injunctive relief and attorneys' fees.

## COUNT FIVE
### (Tortious Interference with Business Relations)

79. The Firm repeats and incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if set forth fully herein.

80. By taking the Firm's protected trade secrets for their own benefit, in violation of the Defend Trade Secrets Act, the Maryland Uniform Trade Secrets Act, and the Virginia Uniform Trade Secrets Act, without justification or excuse, prior to the termination of their

employment, and by utilizing the contact information derived from the confidential client list to relay defamatory communications regarding the Firm, Defendants have unlawfully and tortiously interfered with the Firm's business relations and prospective business relations with highly valued clients.

81.    Further, by taking direction from Equity Partner Co-Conspirator #1, while employed by the Firm, and repeatedly failing to follow, ignoring, or otherwise refusing to follow directives to prepare and process paperwork for Client #1 to interfere with the appointment of Lashley as Trustee, Williams has unlawfully and tortiously interfered with the Firm's business relations and prospective business relations with clients.

82.    The Firm has suffered or will imminently suffer financial injury by Defendants' current tortious interference with its business relations and prospective business relations with clients.

83.    Defendants acted with intent to harm the Firm, or with conscious indifference to the consequences of her actions.

84.    The Firm has been, and continues to be, damaged by Defendants' actions.

## COUNT SIX
### (Defamation)

85.    The Firm repeats and incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if set forth fully herein.

86.    Defendants made false and misleading statements to the Firm's clients regarding the Firm's security of the client's documents.

87.     Defendants' statements were of the character that would tend to degrade the Firm's public standing.

88.     Defendants' statements were made with actual malice in an attempt to persuade the Firm's clients to request to be transferred with Equity Partner Co-Conspirator #1 to her competitive firm.

89.     Defendants acted with intent to harm the Firm, or with conscious indifference to the consequences of her actions.

90.     The Firm has been damaged by Defendants' actions.

## COUNT SEVEN
### (Civil Conspiracy)

91.     The Firm repeats and incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if set forth fully herein.

92.     Defendants and Equity Partner Co-Conspirator #1 confederated to steal and misuse the Firm's confidential information, send communications on behalf of the Firm's Managing Partner without authorization, and make defamatory statements disparaging the Firm in their communications with Firm clients.

93.     In doing so, Defendants and Equity Partner Co-Conspirator #1 conspired and agreed to: (1) misappropriate the Firm's trade secret information in violation of the Defend Trade Secrets Act of 2016, the Maryland Uniform Trade Secrets Act, and the Virginia Uniform Trade Secrets Act; (2) tortiously interfere with the Firm's business relations; and (3) breach their fiduciary obligations to the Firm.

94.     The Firm has been damaged by Defendants' and Equity Partner Co-Conspirator #1's collective unlawful and/tortious actions.

## PRAYER FOR RELIEF

The Firm has suffered and continues to suffer, immediate, irreparable, and substantial injury and damage to its business, goodwill, and client relations as the result of the conduct of Defendants. As a result, the Firm has no plain, adequate, or complete remedy at law, and this action, with the Firm's request for permanent injunctive relief, is its only means of securing an adequate remedy.

WHEREFORE, the Firm respectfully further prays that the Court advance this matter to be heard at the earliest practicable date on the permanent injunction sought by the Firm, cause this action to be expedited, and upon such hearing further order as follows:

A.     An injunction enjoining Defendants from directly or indirectly, alone or in concert with others, from engaging in any further defamatory rhetoric;

B.     An injunction enjoining Defendants from directly or indirectly, alone or in concert with others, from any further use of the Firm's trade secret information;

C.     Award compensatory damages in an amount to be determined and in excess of $75,000;

C.     Award the Firm's reasonable attorneys' fees pursuant to the various implicated trade secret statutes; and

D.     Award such other relief deemed appropriate by the Court.

Dated: September 16, 2025                    Respectfully submitted,


/s/ *Parker E. Thoeni*
Parker E. Thoeni (Bar No. 30250)
Courtney B. Amelung (Bar No. 13422)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One South Street, Suite 1800
Baltimore, MD 21202
Telephone: (410) 752-1040
parker.thoeni@ogletree.com
courtney.amelung@ogletree.com

*Attorneys for Plaintiff*